**EJUSTICE LLP**
Jeremy C. Shafer (CA Bar No. 235318)
445 Marine View Avenue, Suite 300
Del Mar, CA 92014
Tel: (888) 215-7834
Email: JeremyS@eJustice.com

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DORMDUDESBREAKS, LLC *dba* DORM DUDES,<br><br>Plaintiff,<br><br>vs.<br><br>TIKTOK INC. and any successors in interest; BYTEDANCE INC.; TIKTOK USDS JOINT VENTURE LLC; FANATICS INC. and its successors in interest; FANATICS, LLC; FANATICS COLLECTIBLES INTERMEDIATE HOLDCO, INC.; FANATICS HOLDINGS, INC.; FANATICS SPV, LLC; AND DOES 1–50, INCLUSIVE,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br>**(1) Violation of Sherman Act §1 (Conspiracy in Restraint of Trade)**<br>**(2) Violation of Sherman Act §2 (Monopolization / Attempted Monopolization)**<br>**(3) Violation of Clayton Act §3 (Exclusive Dealing)**<br>**(4) Violation of California Cartwright Act**<br>**(5) Violation of California Unfair Competition Law (Bus. & Prof. Code §17200)**<br>**(6) Tortious Interference with Contractual Relations**<br>**(7) Tortious Interference with Prospective Economic Advantage**<br>**(8) False Advertising and Unfair Competition (Lanham Act §43(a))**<br>**(9) Common Law Unfair Competition**<br>**(10) Breach of Covenant of Good Faith & Fair Dealing**<br>**(11) Request for Injunctive Relief**<br><br>**JURY TRIAL DEMANDED** |

# I. INTRODUCTION

1. This case arises from anti-trust violations and unfair and deceptive business practices, among Defendants Fanatics, LLC and its affiliated entities, Fanatics, Inc.; Fanatics Collectibles Intermediate Holdco, Inc.; Fanatics Holdings, Inc.; and Fanatics SPV, LLC (collectively, "Fanatics" or "Defendant Fanatics"), and ByteDance Inc., TikTok Inc., and TikTok USDS Joint Venture LLC (collectively, "TikTok" or "Defendant TikTok"), who conspired to monopolize the sports memorabilia market, suppress competition, and destroy independent sellers known as "Breakers."

2. The allegations as set forth in this complaint are not about content moderation or editorial discretion. Instead, they are about a coordinated scheme among Defendants Fanatics and TikTok to control access to a dominant digital marketplace and to exclude independent competitors from that market. By leveraging licensing power, platform control, and selective enforcement actions, Defendants conditioned access to consumers on compliance with exclusionary arrangements, foreclosed competition in a critical distribution channel, and redirected market demand to Fanatics-controlled products. Plaintiff challenges Defendants' anticompetitive conduct as participants in the marketplace, not any protected publishing activity.

3. The Plaintiff, like the other Breakers similarly situated, purchased authentic merchandise and memorabilia after the first sale from the owner, the holder assigned the exclusive rights to sell such items or authorized sellers licensed by either the owner or the one assigned the rights to the intellectual property displayed on the merchandise being sold and bearing trademarked National Football League ("NFL") and Team Club logos. Plaintiff, like other Breakers purchased the items being sold on Defendant TikTok's sales platforms directly from entities authorized to sell them, including those assigned exclusive intellectual property rights, all in full compliance with 17 U.S.C. § 109 et seq.

4. Defendants, lacking a lawful basis to assert copyright or trademark infringement with respect to Plaintiff's sale of genuine, lawfully acquired memorabilia, therefore resorted to threats, intimidation, and coercion, including, but not limited to, misrepresenting to other social media platforms such as eBay and Facebook, that Fanatics had been granted by the NFL the exclusive rights and was the sole authorized distributor of official NFL and club member apparel, equipment and other memorabilia creating public misperception and confusion among social media sales platforms that prohibit infringement upon any form of copy right or trademark to suppress lawful competition.

5. Fanatics did not at any time possess the exclusive right to all categories of NFL memorabilia, and Defendants knowingly made false and misleading claims of exclusivity to the public and online social media platforms with the assistance from TikTok, the most effective sales platform that reaches the largest audience, and placed barriers to competition by preventing access to their sales marketing platforms and would not allow any use of its algorithm unless the competition entered into an agreement with Fanatics to exclusively purchase from them and pay Fanatics a percentage of all sales.

6. Those who were already established competitors were removed under false pretext without due process prior to removal and in violation of TikTok's very own policy. Following removal, competing breakers were presented with very similar ultimatums and if accepted they were immediately placed back on TikTok's marketing platform. Years of seniority, investment of money paid to TikTok in continuity together with percentage payment of all sales, increases visibility and reaches a greater audience each day than it did the day before, provided however, that the use of TikTok's algorithmic sales platforms are not interrupted or the TikTok clock is reset, costing the loss of viewership and the traffic of potential buyers searching the Internet for memorabilia. Interruption or resetting the TikTok clock would ordinarily result in potential buyers being directed to competing breakers, yet

it was Fanatics, late to the game, that quickly received senior and priority status. TikTok further directed the goodwill and customer lists from competing breakers to Fanatics to give them an unfair business advantage. Any references to licensing rights herein do not reflect exclusive rights held by Fanatics, which did not exist.

7. The threats made and directed to Plaintiff and many other Breakers consisted of one or more of the following: email, text messages, and/or phone calls from TikTok staff, and authorized Fanatics representatives. These communications reinforced the false impression that independent breakers were acting unlawfully, when in fact they were engaged in lawful resale of authentic goods.

8. As a result of the COVID-19 pandemic beginning in or around March 2020 and the prolonged global travel restrictions and economic disruptions that followed through 2023, a new class of small-business entrepreneurs as referenced above were known as “Breakers” transformed the sports memorabilia industry through innovative livestream sales known as “Box Breaks” on TikTok and similar platforms. These small, independent operators became a cornerstone of the modern collectibles’ economy, driving billions in secondary-market sales and providing direct income opportunities for thousands of Americans and retired professional athletes who participated in autograph signings and memorabilia events.

9. In 2021, Fanatics—backed by massive private equity funding from Silver Lake Technology Management, L.L.C. (“Silver Lake”) and with equity participation from the NFL and other sports leagues—embarked on a campaign to vertically integrate and ultimately monopolize the collectibles and memorabilia industry. Fanatics acquired non-exclusive licensing rights from the major sports leagues and players’ associations, purchased the historic trading card manufacturer Topps, and launched new internal brands such as Under Wraps, designed to dominate the autograph and memorabilia markets previously serviced by independent dealers and breakers.

10. At the same time, Fanatics began consolidating control of digital sales channels. Leveraging its relationships with league owners, investors such as Silver Lake, and key technology partners, Fanatics developed its own live-commerce platform, Fanatics Live, while orchestrating restrictive distribution and reporting rules for hobby shops and breakers, effectively cutting off supply to independent breakers and imposing unfair contractual conditions, including pressuring and coercing independent breakers to enter into agreements with Fanatics as a condition of continuing to operate.

11. Defendant TikTok, in coordination with members of TikTok's U.S.-based investor group, acted in concert with Fanatics by suppressing or banning Plaintiff and other breakers who had applied for and were granted licenses to market, sell, and distribute merchandise following review and approval by the National Football League Players Association ("NFLPA").

12. The NFLPA has the authority to grant licenses to third-party distributors and breakers who sell and distribute NFL sports memorabilia and merchandise under the Collective Bargaining Agreement (hereinafter "CBA") by and between the NFL, team owners ("Club(s)") and the NFLPA on behalf of the players entered on March 15, 2020 for a term ending in March 2031.

13. The CBA governs the various rights and entitlements of the parties, including the individual players, relating to use of the NFL logo, Club logos, and name, image and likeness of Players to promote and/or generate additional revenue (referred in the CBA as "AR"), throughout the period of time between March 15, 2020 and the date of this action was filed.

14. This CBA, and the one before it, recognizes the Player's right to his name, nickname, initials, likeness, image, picture, photograph, animation, persona, autograph, signature (including facsimiles thereof), voice, biographical information, data concerning performance and/or movement.

15. Likewise, the CBA, including the one before it, recognized that each Club has certain rights relating to the use of its logo.

16. The CBA further defines the rights of the NFL to use its logo and Club logos, that are uncontested, and agreed rights without concession, and exceptions to both.

17. Among the exceptions agreed by the NFL and its affiliates and Clubs as set forth under the CBA at page 335, the Players and the NFLPA retain any Publicity Rights for use in licensed consumer products, whether traditional or digital (e.g., video games, trading cards, apparel), other than to the extent such products constitute programming (as described herein) or news and information offerings regardless of medium (e.g., DVDs, digital highlight offerings, inclusion of NFL game highlight clips within a video game).

18. The Players assigned to the NFLPA their rights to name, nickname, initials, likeness, image, picture, photograph, animation, persona, autograph, signature (including facsimiles thereof), voice, biographical information, and data concerning performance and/or movement to promote and generate additional revenue, including the authority to screen and license third-party applicants seeking to sell and distribute merchandise and memorabilia and to ensure that the appropriate share of proceeds from such sales are accounted for and collected.

19. At all times material hereto, Plaintiff complied with all NFL policies related to the operation of its business.

20. At no time material hereto was Plaintiff subject to any violation or charged with infringement of the terms of any assigned intellectual property rights or licensing agreement by any third-party from whom he purchased NFL merchandise and memorabilia to sell online

21. Neither the NFL nor any of its affiliates had any lawful basis to prohibit the resale of genuine, lawfully acquired Riddell helmets.

22. Neither Fanatics nor any of its affiliates named in this action own any trademark, copyright, patent, or hold any other right to restrict the sale and resale of authentic apparel manufactured by third parties.

23. Plaintiff, like many other Breakers, lawfully sold non-Fanatics memorabilia on the TikTok platform.

24. Pursuant to 17 U.S.C. § 109(a), the owner of a lawfully made copy may sell or otherwise dispose of that copy. Separately, the resale of genuine goods is generally permissible under trademark law, subject to applicable exceptions.

25. Plaintiff, like many other Breakers, entered a contract with TikTok to market to consumers and use its e-commerce platform to sell merchandise.

26. Under this agreement, TikTok charges fees associated with search terms and promotional placement within its recommendation algorithm. Continued use of the platform over time increases a seller's visibility and ranking relative to competitors, which in turn increases sales. TikTok also required Plaintiff and other sellers to pay a percentage commission on all sales conducted through the platform.

27. TikTok exercised independent economic control over seller participation, algorithmic promotion, consumer visibility, and monetization opportunities within its commerce platform. In doing so, TikTok acted as an economic actor participating directly in the relevant market for livestream memorabilia sales rather than solely as a publisher of third-party speech or content.

28. This model allowed TikTok to generate substantial revenue while encouraging continuous platform engagement. Plaintiff and other breakers who invested significant time and money were able to reach millions of consumers, contributing to billions of dollars in secondary-market memorabilia sales, from which TikTok received commissions under its standard agreements, including the agreement entered into by Plaintiff.

29. TikTok made available to the public its policies that are required to be followed while using its algorithm and marketing platform.

30. TikTok also made available to the public policies purporting to provide fundamental fairness, including a full and fair opportunity for any person accused or suspected of a policy violation to be heard and to present evidence of compliance without interruption that could affect visibility or reach, pending a decision or opportunity to cure.

31. Plaintiff, like other Breakers, relied upon TikTok's representations that it would provide reasonable notice and a fair opportunity to be heard, and allow sellers to present evidence of compliance through an impartial representative, without interruption of services until a decision was made finding a policy violation or allowing an opportunity to cure.

32. TikTok's livestream commerce ecosystem constituted a distinct and commercially significant distribution channel within the sports-memorabilia market because seller success depended upon accumulated algorithmic visibility, follower retention, livestream engagement history, and platform-based network effects that could not reasonably be replicated through traditional retail channels or competing social-media platforms. Once a seller lost TikTok visibility or account access, years of accumulated goodwill, customer acquisition, and algorithmic ranking were effectively destroyed and could not be restored through ordinary market competition.

33. TikTok removed Plaintiff and other independent breakers from the TikTok platform through permanent account bans, demonetization, and algorithmic demotion, without providing notice or any opportunity to be heard, despite Plaintiff's full compliance with licensing and platform rules.

34. Under this agreement, Plaintiff paid TikTok substantial sums of money in platform fees and commissions.

35. Upon information and belief, TikTok recognized that strengthening its position in the sports collectibles market could enhance its valuation in connection with a potential restructuring, sale, or other strategic transaction involving U.S.-based ownership.

36. At all relevant times, TikTok was not acting merely as a passive publisher of third-party content, but as an active commercial marketplace participant that provided paid e-commerce infrastructure, algorithmic promotion, transaction processing, livestream sales tools, and consumer-access distribution services to sellers such as Plaintiff. TikTok charged platform fees, commissions, promotional-placement fees, and other monetization charges tied directly to sales visibility and consumer reach. Plaintiff's claims arise from TikTok's commercial conduct in controlling access to a dominant live-commerce marketplace and participating in exclusionary agreements that foreclosed competition, not from any protected editorial or publishing function.

37. This conspiracy caused the systematic removal of thousands of legitimate small businesses from TikTok's e-commerce ecosystem, wiping out years of earned goodwill, algorithmic priority, and consumer trust. The exclusionary conduct also eliminated key income sources for former NFL players and other professional athletes who once benefited from independent autograph signings and memorabilia appearances but were displaced by Fanatics' purported licensing and house-brand programs. Consumers also suffered reduced choice and higher prices as a result of Defendants' exclusionary conduct. Defendants' conduct created the false perception that independent breakers had violated intellectual property laws, when in fact no such violations had occurred. This misrepresentation allowed Defendants to appropriate the goodwill, audience reach, and market position that Plaintiff and other breakers had spent years developing.

38. Michael Rubin, Fanatics' CEO, and Silver Lake, one of its principal private-equity investors, played significant roles in the strategic consolidation of the memorabilia market. Their capital and strategic direction enabled Fanatics to leverage its non-exclusive licensing agreements with the NFL and its commercial influence with technology partners such as TikTok to erect artificial barriers to entry and destroy competition.

**<u>Defendants' Coordinated Scheme</u>**

39. Defendants operated through a coordinated hub-and-spoke conspiracy in which Fanatics and TikTok acted as central participants coordinating exclusionary enforcement across dominant digital sales platforms, including TikTok. Through direct communications, coordinated intellectual-property complaints purportedly from the NFL, uniform enforcement demands, and shared economic incentives tied to Fanatics' market dominance, Defendants collectively pressured independent breakers either to enter Fanatics-controlled arrangements or face exclusion from critical distribution channels.

40. Defendants' conduct and their co-conspirators' coordinated actions from 2020 through 2026—including Fanatics' acquisitions, the launch of Fanatics Live and Under Wraps, the NFL's direct participation as an equity partner, and TikTok's assistance—constituted a continuing course of exclusionary conduct.

41. After Defendants eliminated independent competition from TikTok's marketplace, the platform's algorithm was adjusted in a manner that elevated Fanatics' visibility ahead of all other sellers. Plaintiff and many similarly situated breakers—who had pioneered live-stream memorabilia sales on TikTok and built the market long before Fanatics entered—lost their accumulated algorithmic seniority and were forced to shut down their businesses.

42. As a direct and proximate result of Defendants' conduct, Plaintiff and thousands of other independent breakers lost all algorithmic seniority and market visibility on TikTok and other online sales platforms. Plaintiff and similarly situated breakers had paid TikTok substantial sums in platform fees, including, upon information and belief, amounts in the range of approximately $25,000 per month, plus a percentage commission on all sales, including commissions of approximately six percent (6%), and had invested years of labor to build algorithmic seniority, audience reach, customer goodwill, and sustainable businesses on the platform.

43. Defendants' coordinated threats, intimidation, and coercion caused online platforms, including TikTok, eBay, and Meta, to ban or suppress properly licensed independent breakers. In doing so, Defendants breached existing platform contracts, policies, and procedures; interfered with Plaintiff's contractual and business relationships; and acted in violation of their own intellectual-property licensing agreements.

44. This conduct was undertaken to eliminate competition, suppress higher-quality competing products, and consolidate control of the sports-memorabilia market in favor of Fanatics, contributing to Fanatics' dominant market position. As a result, Plaintiff lost substantial damages in an amount to be proven at trial, including lost revenue, customer goodwill, and algorithmic seniority.

45. Plaintiff entered into a verbal agreement via business consultants he had trusted for years to manage its TikTok seller account to purchase and sell exclusively Fanatics football helmets (including its Under Wraps NFL helmets). Plaintiff was informed that such an agreement was required to continue selling NFL-licensed products on TikTok.

46. This scheme was further enabled by Defendants' misrepresentations to platforms and the public that the NFL was purportedly reporting breaker's sports memorabilia sales or auction as trademark infringement violations, and that Fanatics had been granted exclusive rights by the NFL, which created a pretext for removing competing sellers and redirecting consumer traffic.

## II. JURISDICTION AND VENUE

47. This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 (federal antitrust and unfair competition laws) and under 15 U.S.C. §§1, 2, 14, and 1125.

48. Supplemental jurisdiction exists under 28 U.S.C. §1367 for Plaintiff's state law claims.

49. Venue is proper under 28 U.S.C. § 1391(b) because at least one Defendant resides in this District, several Defendants transact substantial business in

this District, and a substantial part of the events giving rise to this action—including platform enforcement, algorithmic suppression, and commercial sales activity—occurred in this District.

50. This Court has personal jurisdiction over Defendant TikTok USDS Joint Venture LLC because it purposefully directs and controls TikTok's U.S. operations, including algorithmic recommendation systems, content moderation, monetization policies, and enforcement decisions that caused harm to Plaintiff in this District.

## III. PARTIES

51. Plaintiff DORMDUDESBREAKS, LLC is an Ohio limited liability company organized on December 6, 2023. Plaintiff used the trade name "Dorm Dudes" from December 2023 to present, during which time it engaged in the retail sale and marketing of sports memorabilia, including live-stream sales activities on digital platforms. Plaintiff's principal place of business is located at 26 W Main St, Ashland, OH 44805. Plaintiff brings this action for injuries sustained to its business as a result of Defendants' unlawful, exclusionary, and anticompetitive conduct alleged herein. Zachary Balo is the founder, owner, principal operator and, at all relevant times, directed and controlled the operations of the memorabilia business.

52. Defendant Fanatics is a group of affiliated, successor, and related entities, including Fanatics, LLC; Fanatics Collectibles Intermediate Holdco, Inc.; Fanatics Holdings, Inc.; and Fanatics SPV, LLC, with principal operations headquartered in Jacksonville, Florida. Fanatics is a global digital sports platform engaged in the manufacture, marketing, licensing, and sale of sports merchandise and maintains extensive commercial relationships with major professional sports leagues, including the National Football League ("NFL").

53. At all relevant times, Fanatics conducted substantial business within the State of California and this District through online sales, licensing enforcement, digital advertising, and coordinated platform-based distribution activities directed at consumers and market participants in California. Plaintiff alleges that Fanatics,

acting alone and in concert with the NFL and social-media platform TikTok, engaged in unfair, deceptive, and exclusionary practices that distorted competition, interfered with existing contractual relationships, and caused substantial harm to Plaintiff's business and competition within the Central District of California.

54. At all relevant times, Fanatics, LLC; Fanatics Collectibles Intermediate Holdco, Inc.; Fanatics Holdings, Inc.; and Fanatics SPV, LLC (collectively, "Fanatics") operated as a single integrated enterprise with common ownership, overlapping officers and directors, centralized control over licensing, distribution, and enforcement decisions, and a unified anticompetitive strategy. Each Fanatics entity acted as the agent, alter ego, co-conspirator, or instrumentality of the others with respect to the conduct alleged herein. As used in this Complaint, "Fanatics" refers collectively to these entities and their respective parents, subsidiaries, affiliates, predecessors, and successors in interest.

55. Defendant TikTok, Inc. is a corporation organized and existing under the laws of the State of California, with its principal place of business located at 5800 Bristol Parkway, Suite 100, Culver City, California 90230. TikTok Inc. conducts substantial business throughout the United States, including within this District, through its operation of the TikTok social-media and e-commerce platform and related services.

56. As used herein, "TikTok" refers collectively to the TikTok social-media and e-commerce platform operated, controlled, and monetized by TikTok Inc. and its parent company, ByteDance Inc., including through their agents, employees, subsidiaries, affiliates, and related entities. At all relevant times, TikTok provided algorithm-driven market access, payment processing, and promotional tools to sports-memorabilia sellers and exercised discretionary control over visibility, access, enforcement, and account termination decisions affecting Plaintiff and other independent breakers.

57. Defendant ByteDance Inc. is a corporation organized and existing under the laws of the State of Delaware, formed January 21, 2016 with its principal place of business located at 1199 Coleman Avenue, San Jose, CA 95110. ByteDance Inc. is a wholly owned subsidiary of ByteDance Ltd., a global technology company headquartered in Beijing, China. ByteDance Inc. conducts substantial business operations throughout the United States, including in this judicial district, by overseeing and managing various platforms and technologies, including but not limited to the TikTok social media platform. ByteDance Inc. is subject to the personal jurisdiction of this Court by virtue of its continuous and systematic contacts with the United States and this District.

58. Defendant TikTok USDS Joint Venture LLC is a Delaware limited liability company formed under the laws of the State of Delaware that, upon information and belief, operates the TikTok platform in the United States and is responsible for the management, policy, governance, and operation of TikTok's U.S. services. TikTok USDS Joint Venture LLC is controlled by a consortium of investor entities that acquired it from ByteDance Ltd. and related entities. TikTok USDS Joint Venture LLC is a successor in interest to TikTok's prior U.S. operations and has adopted, ratified, and continues to enforce the policies, bans, and exclusionary conduct alleged herein.

59. For convenience, certain factual references herein may refer to TikTok USDS Joint Venture LLC and investor participants in TikTok's U.S. governance structure, including Oracle Corporation and MGX Fund Management Limited, as the "U.S. TikTok Investors." Oracle Corporation and MGX Fund Management Limited are referenced for factual context only and are not named Defendants.

60. Doe Defendants 1–50 are presently unknown co-conspirators. Plaintiff will amend this Complaint to identify them when their identities are discovered. Plaintiff also includes as Defendants any successors in interest to the named Defendants.

## IV. FACTUAL ALLEGATIONS

61. Plaintiff DORMDUDESBREAKS, LLC *dba* "Dorm Dudes" is a memorabilia "breaker" and online retailer based in Ashland, Ohio, operating live-stream sales of licensed sports memorabilia and collectibles acquired from independent distributors and former professional athletes.

62. Plaintiff, like numerous other breakers, depended heavily on the TikTok platform to reach fans and buyers. Over time, Plaintiff developed a large follower base, accumulated algorithmic seniority, and engaged in frequent livestream sales of sports memorabilia.[1] Plaintiff sold licensed NFL merchandise, including authenticated autographed helmets and jerseys, sourced from authorized suppliers like Just Break It and The Real Autograph ("TRA"). Plaintiff was also the first breaker to sell autographed NFL helmets that were custom painted by artists, one-of-a-kind works, that became the most sought after helmets by sports memorabilia fans on TikTok.

63. In the final quarter of 2024, Dorm Dudes generated roughly $3.2 million in sales, had one of the largest follower counts on TikTok for sports memorabilia, and closed out the year with a big streaming live event with several famous athletes, including Shaquille O'Neal, Tyrek ("Cheetah") Hill and Chad ("Ochocinco") Johnson, which included a cyber truck Christmas giveaway.[2] Sales should have continued to grow into 2025, but did not as explained further below.

64. While Plaintiff entered 2025 on a wave of tremendous success, Plaintiff began experiencing repeated banning, account closures, and loss of traffic and buyers. At the beginning of its operations, Plaintiff engaged the services of SNL Consulting, owned by Sean Ceruti ("Ceruti") and Lawrence (Larry) Legend ("Legend"), to manage its TikTok seller account and keep the account in compliance

[1] *See*, https://www.ashland.edu/news/dorm-dudes-breaks-sports-memorabilia-selling-business-really-takes-au-students

[2] *See*, https://www.ashland.edu/news/dorm-dudes-name-becoming-more-and-more-recognized-beyond-au

with TikTok guidelines. SNL Consulting claimed they could get violations removed quickly and get fast answers from TikTok. A true and accurate copy of the Consulting Agreement is attached hereto as **Exhibit A.**

65. At the start of 2025 Plaintiff was informed by SNL Consulting that continuing to sell TRA products would get Plaintiff's TikTok account permanently banned. They claimed TRA products violated NFL trademarks and Plaintiff had been receiving violations. *See,* example of TikTok account violation Plaintiff was receiving attached hereto as **Exhibit B**, this one alleging a purported "trademark infringement" and citing "Green Bay Packers". Plaintiff was warned not to sell any memorabilia that was not from Fanatics. *See,* text message from Legend on August 18, 2025, a true and accurate copy of which is attached here to as **Exhibit C**.

66. Plaintiff was led to believe by Ceruti and Legend (SNL Consulting) as well as by Steve Halupka ("Halupka"), the TikTok Shop US Sports Collectibles Team Lead, that Fanatics was the only licensed option available to Plaintiff to sell full-sized licensed NFL helmets on TikTok. *See*, text message from Legend on September 4, 2025, a true and accurate copy of which is attached hereto as **Exhibit D**.

67. Plaintiff was even engaged by Ceruti to speak with other breakers that had been banned on TikTok for purported NFL trademark violations to convince them that Fanatics was the only option they had to sell NFL licensed sports memorabilia. For example, another popular breaker, Crippen Rippen, had been banned and at Ceruti's request, Plaintiff reached out and explained that Fanatics was Crippen Rippen's only option to remove the TikTok ban and sell licensed NFL products, which he did and continues to do.

68. Plaintiff learned that Ceruti and Legend had personal and financial stakes in steering their breaker clients to Fanatics and away from its competitors. Plaintiff learned they were owners or stakeholders in L2 Global LLC, an authorized distributor of Fanatics products to Fanatics' network wholesale channels and

contracted live sellers. Ceruti and Legend used their relationship as consultants to advise their clients like Plaintiff to exclusively purchase and sell Fanatics products, while maintaining a financial interest as the authorized distributor for Fanatics.

69. Halupka, while a TikTok employee, also acted as an intermediary or sales channel between Plaintiff and Fanatics, taking and placing orders of Fanatics NFL helmets, called Under Wraps. *See,* text message from Steve Halupka on June 17, 2025, a true and accurate copy of which is attached hereto as **Exhibit E**.

70. Plaintiff stopped selling TRA products in 2025 and was left with over a million dollars in inventory he could not sell. He purchased NFL helmets from Fanatics at an inflated price of $625/helmet, based on the representations made by Ceruti and Legend that they were the best in the industry. However, the quality was lacking, many of the Fanatics-exclusive players who autographed them were not popular or well-liked, and sales slowed.

71. Plaintiff then started packaging his own memorabilia and commissioned a spray-paint artist to customize authentic NFL jerseys. Ceruti reached out to Plaintiff interested in buying some of the jerseys. Plaintiff sent samples which he learned were being sold by Ceruti to Fanatics. Plaintiff was then subsequently instructed by Ceruti that the custom jerseys were also not licensed and could not be sold on its memorabilia channel any further.

72. Plaintiff was essentially squeezed out the NFL sports memorabilia market, as he refused and to buy and sell exclusively from Fanatics, losing revenue and many valuable employees as a result, and relied on selling other kinds of products through his sales channels, including shoes and golf clubs. As recently as December, 2025, while on a phone conference with Dorm Dudes' TikTok designated representative, Catherine Tai, Halupka joined in to suggest they try selling Fanatics Under Wraps helmets again to increase their viewership. Halupka tried to pitch Plaintiff that he would have special opportunities to stream with popular Fanatics-

signed athletes, something Plaintiff had successfully accomplished all on his own just a year before Defendant TikTok's and Fanatics' intervention.

73. The sports memorabilia/collectibles industry is a high-value market. Publicly available market reports estimate the global sports memorabilia collectibles market at US $26.9 billion in 2024, with projections to US $42.1 billion by 2030. The U.S. sports collectibles market in particular is expected to grow at a compound annual growth rate of ~12.8%.

74. Upon information and belief, as a partial equity holder in Fanatics, the NFL stood to benefit from increases in Fanatics' enterprise value associated with consolidation of the memorabilia market.

75. Consistent with the foregoing, the NFL used its licensing and branding leverage to pressure TikTok and other market participants to align with Fanatics' purported exclusivity representations and scheme.

76. Fanatics' enforcement of its nonexistent intellectual property rights assigned by the NFL and club owners, purported exclusivity demands, platform coordination with TikTok, and negotiation of breaker contracts were centrally directed and approved at the parent and holding-company level, rather than by isolated subsidiaries acting independently.

77. The NFL, acting through its commercial subsidiary NFL Properties, LLC, entered into and maintained a close financial and strategic partnership with Fanatics, including holding an equity interest in Fanatics that aligns the League's financial success with Fanatics' market dominance. By combining its role as the primary licensor of league marks with its position as an investor in Fanatics, the NFL created an inherent conflict of interest. The League's licensing policies and commercial strategies were no longer aimed at maximizing fair competition or player compensation but at inflating the value of Fanatics—its own portfolio company—at the expense of independent dealers, retired players, and small businesses such as Plaintiff.

78. In cooperation with Fanatics Chief Executive Officer Michael Rubin and private-equity backer Silver Lake**,** the NFL facilitated a vertical integration of the sports-memorabilia industry that stripped competitors of access to licensed products. The League's endorsement and participation in Fanatics' falsely asserted exclusivity arrangements effectively foreclosed Plaintiff and other "breakers" from selling lawful NFL-branded collectibles unless those items were purchased through Fanatics' controlled distribution channels. The NFL's financial interest in Fanatics gave it a direct incentive to support these restrictive practices, despite their predictable effect of destroying open competition within the memorabilia marketplace.

79. Upon information and belief, consolidation of the live-stream memorabilia market enhanced Fanatics' valuation in anticipation of a potential IPO or other strategic transaction. The suppression of independent breakers and concentration of distribution channels materially strengthened Fanatics' reported market dominance metrics.

80. The NFL's cooperation also undermined its obligations under the Collective Bargaining Agreement ("CBA") with the NFL Players Association ("NFLPA")**,** which requires the League to preserve players' rights to license their names, images, and likenesses through fair and competitive means. By steering a substantial portion of memorabilia licensing to Fanatics and its subsidiaries—such as "Fanatics Authentic" and "Under Wraps"—the NFL reduced opportunities for individual players, particularly retired or fringe players, to earn income from independent autograph signings and memorabilia appearances. This monopolistic structure diverted player-related revenues into the NFL-Fanatics enterprise while eliminating long-standing supplemental income streams that the CBA was designed to protect.

81. Through these actions, the NFL knowingly participated in and benefited from a broader scheme to suppress independent commerce on social-media

platforms, including TikTok**,** where thousands of breakers previously conducted legitimate business. The League's alignment with Fanatics and TikTok's enforcement of Fanatics-driven purported exclusivity rules resulted in widespread account bans, removal of live-selling privileges, and loss of algorithmic standing for small breakers such as Plaintiff. The League's conduct directly contributed to Plaintiff's exclusion from the digital marketplace and to the destruction of the competitive ecosystem that had flourished during the pandemic collectibles boom.

82. As a proximate result of the NFL's cooperation with Fanatics and its disregard of its own collectively bargained duties, Plaintiff suffered severe economic damages, including the loss of substantial revenues, irreversible de-ranking within TikTok's algorithm, and the collapse of customer goodwill built over years of lawful business activity. The NFL's participation in this scheme not only violated its obligations to the players whose likenesses it commercializes but also constituted a willful and unlawful restraint of trade that injured Plaintiff and similarly situated small businesses across the United States. These facts are alleged solely to demonstrate Defendants' anticompetitive conduct, incentives, and market effects, and are not intended to assert claims on behalf of NFL players or the NFLPA.

83. Upon information and belief, TikTok had financial incentive to leverage its position in the sports memorabilia niche to enhance its valuation in connection with a future sale or restructuring into American-based ownership, and therefore had reason to enforce Fanatics' purported exclusivity demands.

84. Upon information and belief, Fanatics, in turn, sought to harness TikTok's powerful algorithmic reach to significantly increase its market share for licensed sports memorabilia. Fanatics anticipated that by controlling which sellers could access TikTok's audience, it could foreclose competition, lock in dominant pricing, and create a barrier to entry for new sellers. These actions would bolster its appeal in its anticipated IPO or sale as the undisputed platform for memorabilia commerce.

85. Even before the full implementation of Fanatics' purported licensing restrictions, Defendants exercised present market power by coercing sellers, including requiring sellers to enter into agreements with Fanatics as a condition of continued access to platform audiences, threatening future exclusion, and using TikTok's platform bans and algorithmic demotion to exclude rivals in real time.

86. Because TikTok's recommendation system rewards continuity, engagement history, and accumulated algorithmic ranking, removal from the platform caused permanent and ongoing competitive harm that cannot be fully compensated through monetary damages alone. Plaintiff lost years of accumulated algorithmic seniority, follower engagement, and consumer recognition that cannot realistically be recreated even though reinstatement appeared to have been permitted.

**<u>Defendants' Exclusivity Claims Were False</u>**

87. At all relevant times, Plaintiff was a legitimate, authorized seller of authentic sports memorabilia and collectibles. Plaintiff sold genuine, lawfully sourced NFL merchandise (*e.g.* authentic Speedflex series helmets manufactured by Riddell) with certified player autographs, from distributors like The Real Autograph and complied with applicable intellectual property laws, TikTok's platform rules, and industry standards governing the sale of licensed sports memorabilia.

88. Despite Plaintiff's authorization, Defendants falsely represented to TikTok, its moderators, business partners, and consumers that Fanatics was the sole authorized source of NFL-licensed memorabilia. These representations were false and misleading. Fanatics did not possess exclusive rights to all NFL memorabilia categories, and independent sellers such as Plaintiff were not unauthorized or illegitimate by virtue of selling non-Fanatics merchandise.

89. Defendants' exclusionary conduct lacked any legitimate procompetitive justification because Plaintiff and similarly situated breakers sold authentic, lawfully acquired memorabilia and complied with applicable licensing and platform requirements. Defendants could have addressed any legitimate authenticity concerns

through ordinary verification procedures, notice-and-cure policies, or targeted enforcement against counterfeit goods. Instead, Defendants implemented blanket exclusionary restrictions designed to eliminate lawful competitors and consolidate market control in favor of Fanatics.

90. Defendants used these false exclusivity claims as a mechanism to justify enforcement actions against independent breakers, including account suspensions, permanent bans, demonetization, and algorithmic demotion on TikTok's live-commerce platform. These actions were not based on counterfeit concerns or rule violations but were implemented to advance Fanatics' exclusionary strategy and to coerce compliance with proposed Fanatics-controlled agreements that sellers were told were required to continue operating, thereby creating the misperception that independent breakers were acting unlawfully. Defendants further conditioned access to the platform on entering into Fanatics-controlled agreements, including agreements (written or verbal) requiring exclusivity**.**.

91. Defendants' conduct harmed not only Plaintiff but the competitive process itself by eliminating independent sellers from the livestream memorabilia marketplace, reducing consumer choice, suppressing output of competing products, increasing barriers to entry, restricting alternative channels of distribution, and concentrating market power in Fanatics-controlled entities. Consumers were deprived of competitive pricing, independent memorabilia sources, and diverse livestream sellers who had previously competed openly within the marketplace.

92. The timing, uniformity, and coordinated nature of Defendants' enforcement actions support a plausible inference of concerted action. Following communications from Fanatics and NFL representatives asserting purported exclusivity rights, TikTok implemented substantially identical bans, restrictions, demonetization measures, and algorithmic suppression against independent breakers across the platform in a manner inconsistent with independent decision-making or ordinary content moderation practices.

93. The resulting platform bans and algorithmic suppression caused competitive harm that cannot be fully remedied through monetary damages alone. Plaintiff lost access to established audiences, algorithmic ranking, and the ability to compete effectively in the live-stream memorabilia marketplace, even apart from lost sales revenue.

94. Defendants' false exclusivity representations and coordinated enforcement actions foreclosed independent sellers from a substantial portion of the commercially viable live-stream distribution channel for licensed sports memorabilia, reinforcing Fanatics' market dominance and suppressing competition beyond Plaintiff individually.

95. Beginning in or about the start of 2025, representatives of Fanatics and the NFL communicated directly with TikTok personnel regarding alleged exclusivity violations and intellectual property enforcement. Shortly thereafter, TikTok implemented account suspensions, demonetization measures, and algorithmic suppression affecting Plaintiff and similarly situated breakers.

96. Upon information and belief, Defendants have not and do not uniformly enforce the referenced intellectual-property policies against all sellers of NFL-related memorabilia. Instead, Defendants selectively and discriminatorily enforced such policies, purportedly in response to the NFL flagging violations, against independent breakers and non-Fanatics sellers while permitting Fanatics-affiliated or preferred sellers to continue selling substantially identical products. The enforcement actions taken against Plaintiff were therefore pretextual and undertaken to exclude competition and redirect consumers to Fanatics-controlled distribution channels rather than to prevent counterfeit or unlawful sales.

97. Pursuant to this coordinated scheme, Defendant TikTok—acting pursuant to policies adopted within TikTok's governance structure, which upon information and belief included U.S.-based investor participants such as Oracle Corporation and Silver Lake—began banning Plaintiff despite Plaintiff's compliance

with all laws and platform rules. TikTok implemented and enforced exclusionary restrictions that de-platformed independent breakers engaged in the lawful sale of sports memorabilia outside the Fanatics distribution channel. These bans were not based on counterfeit or authenticity concerns but were enforced to implement Fanatics' exclusion strategy. TikTok circulated internal talking points, or permitted Fanatics to influence them, falsely presenting Fanatics as the sole authorized source for NFL-licensed merchandise.

98. Fanatics falsely represented to Plaintiff and others that it held exclusive rights to certain categories of NFL memorabilia, including Riddell-licensed helmets and related on-field equipment, and that such asserted exclusivity permitted it to demand bans of independent sellers. These false representations and coordinated bans caused Plaintiff, and countless other breakers, substantial financial harm.

**False Claims of Exclusivity Regarding Riddell Helmets**

99. Riddell, Inc. ("Riddell") has served for decades as the official on-field equipment and consumer helmet licensee of the National Football League. Pursuant to a renewed licensing agreement executed in or about 2023, Riddell retains the exclusive right through 2030 to design, manufacture, and market authentic and replica NFL helmets and related headgear bearing official team marks. The license—administered through NFL Properties, a Defendant herein—authorizes Riddell to supply helmets both for professional play and for commercial memorabilia purposes, including collectible and autograph editions widely used in the sports-memorabilia industry. Historically, these licensed helmets formed the core physical product used by breakers, memorabilia retailers, and autograph dealers to create authentic, league-approved merchandise for sale to fans and collectors.

100. Prior to the Defendants' conspiracy, Riddell's helmets were a staple of the independent collectibles' ecosystem. Thousands of breakers, including Plaintiff, purchased Riddell full-size and mini-helmets through distributors or direct wholesalers, obtained player autographs, and sold them through live-streamed sales

on TikTok and other platforms. These activities generated broad consumer engagement and secondary-market value for Riddell's products, reinforcing the prestige and profitability of Riddell's NFL license. By maintaining a diverse marketplace of sellers, Riddell benefited from continuous exposure of its branded helmets, which increased consumer demand and sustained royalty revenue for both Riddell and the NFL.

101. Beginning in 2025, however, Defendant Fanatics**,** and their digital co-conspirators Defendant TikTok, implemented a coordinated scheme to centralize all licensed memorabilia sales under Fanatics' control. Through Fanatics' acquisition of Topps, creation of its internal memorabilia brands "Fanatics Authentic" and "Under Wraps," and distribution agreements that Defendants represented as exclusive, with those representations reinforced by the NFL's ownership stake, Defendants intentionally suppressed independent breakers and diverted the memorabilia trade to Fanatics-controlled platforms. TikTok's subsequent bans and algorithmic demotions of breakers who sold non-Fanatics memorabilia destroyed a major retail outlet for Riddell-licensed helmets, reducing overall demand and visibility for genuine Riddell products in the online marketplace which was plaintiff's best selling product

102. The contraction of independent sales channels directly devalued Riddell's exclusive NFL license**.** Whereas Riddell once enjoyed broad downstream distribution through hobby shops, breakers, and independent signers, it now faces a narrower pipeline dominated by Fanatics' vertically integrated monopoly. Fanatics' prioritization of its own "in-house" memorabilia lines and mystery-box helmet products has diminished consumer recognition of Riddell as the authentic equipment brand of the NFL, eroding brand equity and consumer choice. The loss of independent breakers—previously a vital promotional network—has further depressed sales volume and royalties associated with Riddell's licensed helmets.

103. Although Riddell has the exclusive ownership rights of the NFL's trademark and associated copyrights assigned by contract, Defendants' collective

conduct has substantially impaired the economic value of its exclusive rights**.** The unlawful boycott of independent breakers, such as Plaintiff, and the artificial consolidation of distribution have transformed Riddell's once-vibrant marketplace into a closed, Fanatics-controlled channel. This restraint not only inflicted substantial damages in an amount to be proven at trial upon Plaintiff and similarly situated breakers who relied on Riddell products but also undermined the commercial foundation of Riddell's NFL license itself. By suppressing the competitive ecosystem that sustained demand for authentic NFL helmets, Defendants' actions have harmed both license holders and small businesses, demonstrating the far-reaching anticompetitive effects of their conspiracy. These facts are alleged to demonstrate the falsity of Defendants' exclusivity claims and the anticompetitive effects of Defendants' conduct, not to seek relief on behalf of Riddell, Inc.

104. In fact, at all relevant times, Riddell, Inc. held the exclusive NFL license through March of 2031 to manufacture, distribute, and market authentic and replica NFL helmets and related on-field gear. That license is administered by NFL Properties, which manages the League's commercial intellectual property portfolio.

105. Riddell's license predates Fanatics' acquisition of memorabilia rights and continues to govern the helmet category across both retail and collectible markets. Thus, while Fanatics has broad merchandising rights, it does not own or control the NFL's intellectual property for on-field equipment such as helmets, which remains contractually vested in Riddell.

106. Despite this clear delineation, Defendants Fanatics, TikTok, and NFL Enterprises jointly misrepresented to the public, to sellers, and to TikTok's platform moderators that Fanatics alone held exclusive rights to all NFL-branded merchandise, including helmets and on-field gear.

107. These misrepresentations were communicated through TikTok's enforcement policies, moderator directives, and seller communications. Breakers who listed or displayed Riddell helmets, even if authentic and properly licensed, were

told they were violating Fanatics' exclusive rights and were subsequently banned or demonetized.

108. In reality, Fanatics had no such exclusive right—its agreements extended only to certain categories of fan merchandise, trading cards, and apparel, not to Riddell's long-standing helmet license.

109. These statements were materially false and were used to justify enforcement actions against independent sellers.

110. Part of the coordinated scheme was the pressure exerted by Fanatics in its offer to Plaintiff and others to "fix" the very problem Fanatics created—namely, Fanatics offered to use its influence with TikTok to have Plaintiff reinstated immediately, but only if it agreed to Fanatics' exclusive terms.

111. Plaintiff's TikTok account, which had accrued significant engagement and algorithmic priority, was suspended and ultimately banned after Plaintiff refused to accede to Fanatics' demands. TikTok's algorithmic demotion is irreversible: even if reinstated, Plaintiff cannot recover the same priority or reach.

112. TikTok further compounded the economic damage to Plaintiff, and others similarly situated, by eliminating assigned client representatives that helped individual breaker business become aware of, protest or appeal a violation before an actual ban caused permanent harm. Upon information and belief, this safety valve (direct access to a TikTok account rep) was removed to prevent the amelioration of alleged violations to facilitate the banning of independent breaker businesses that competed with Fanatics' new live breaker product.

113. Facing existential financial pressure following the ban, Plaintiff was pressured to enter into a purported exclusive contract with Fanatics, under threat of permanent exclusion from TikTok and the broader fan marketplace that Defendants falsely represented was required by licensing restrictions. That exclusivity barred Plaintiff from selling any lawful memorabilia from independent sources or former players, effectively choking off its business model.

114. The conspiratorial exclusion was not limited to Plaintiff. Dozens or hundreds of small breakers were similarly banned, coerced, or forced to accept Fanatics exclusivity. Competition in the memorabilia market collapsed; consumer choice narrowed; resale prices and collectible valuations were artificially controlled by Fanatics; and the presumed market value of collectibles held by independent breakers was depressed.

115. Because Fanatics controlled preferential access to TikTok's audience, its ability to block rivals had systemic effect: new entrants in the memorabilia-selling space were foreclosed, and existing independent sellers lost critical distribution channels.

116. The combined effect is a group boycott, a purported exclusive dealing regime, and purported dominant market control over the licensed and authorized sports memorabilia market, which these Defendants deployed to maintain dominance, eliminate competition, and entrench their market power to support the anticipated Fanatics IPO or sale.

## V. INJURY & DAMAGES

117. As a direct and proximate result of Defendants' deliberate, intentional, wonton, reckless and/or negligent misconduct and antitrust violations described above, Plaintiff has suffered substantial harm: loss of revenue, loss of customer base, diminished goodwill, permanent algorithmic demotion, and suppression of its ability to compete on equal footing in the memorabilia market.

118. As a direct and proximate result of Defendants' deliberate, intentional, wonton, reckless and/or negligent misconduct and antitrust violations described above , Plaintiff sustained substantial harm and economic damages, loss of personal income and capital gains, loss of business, loss of property, diminution of value of inventory that cannot be sold, loss of future fulfillment of purchase orders, and has suffered personal injury, including but not limited to severe emotional distress as a direct and proximate result of defendants unlawful conduct and antitrust violations.

119. Defendants wrongful conduct to squeeze plaintiff out was not limited to him but was also intended to restrain or eliminate all other breakers from competing and/or were placed at an unfair disadvantage across the multi-billion dollar memorabilia industry. The scheme inflicted harm to competition and consumer welfare, and not only injury to this one competitor, the plaintiff in this action.

120. By excluding independent breakers from the primary live-commerce platforms for sports memorabilia and coercing exclusivity, Defendants reduced the number of sellers, restricted output, eliminated competitive pricing pressure, suppressed innovation in livestream commerce, and deprived consumers of meaningful choice among authentic licensed memorabilia sourced from diverse channels.

121. The NFL's equity interest, or co-ownership, in Fanatics gave it a direct financial stake in Fanatics' valuation. The inequitable application of targeting competitors of Defendant Fanatics through algorithmic bans and exclusion of breakers, increased the anticipated value of Fanatics in connection with a proposed IPO or sale.

122. TikTok, motivated by the opportunity to help drive up Fanatics' valuation and affirm its own dominance in the sports memorabilia sales niche, knowingly participated in coordinated enforcement with Fanatics and the NFL. TikTok's suppression of rival breakers and preferential treatment of Fanatics merchandise was intended to help guarantee Fanatics' position as a dominant platform in the memorabilia space.

123. The bans, algorithmic demotion, and forced exclusivity contracts caused Plaintiff to suffer substantial damages in an amount to be proven at trial, including the loss of access to its following. Plaintiff's algorithmic seniority — built over years and at significant financial cost— is permanently impaired, and any reinstatement will not restore prior ranking or reach. This constitutes injury that is irreparable in nature.

124. The forced purported exclusive contract deprived Plaintiff of autonomy to source from independent distributors or former players, locking it into unfavorable terms and excluding it from competing fairly in the memorabilia market.

125. The scheme imposed market-level harm: competition was suppressed, consumer choice reduced, prices inflated by the monopolist, and independent sellers' collectible valuations weakened and quality suffered.

126. Plaintiff seeks damages in an amount to be proven at trial and determined by the trier of fact, (including trebling under 15 U.S.C. §15), injunctive relief restoring its TikTok account with full algorithmic seniority, cancelation of any coercive exclusive contract, and an order preventing Defendants from further anticompetitive conduct.

127. Plaintiff is a direct market participant whose exclusion was the intended and immediate result of Defendants' anticompetitive conduct. Plaintiff's injuries are neither speculative nor remote, and no more direct or efficient enforcer exists to vindicate the competitive harms caused by Defendants' scheme.

**Relevant Market**

128. The relevant product market is the live-stream, social-media-based retail sale of licensed NFL sports memorabilia in the United States. The relevant geographic market is the United States.

129. The relevant market is economically distinct from traditional brick-and-mortar memorabilia retail and from static online marketplaces such as eBay or general e-commerce platforms. Live-stream social-media sales involve real-time interactive auctions, algorithmic promotion, follower accumulation, and platform-specific visibility metrics that cannot be replicated through static listings or traditional retail channels.

130. Sellers on live-stream platforms invest substantial time and capital to build algorithmic seniority, follower bases, and audience engagement. Once accumulated, this algorithmic ranking functions as a barrier to exit because it cannot

be transferred to competing platforms. Switching to a new platform requires rebuilding audience reach from zero, resulting in immediate and substantial loss of revenue.

131. Consumers similarly experience platform lock-in effects, including follower subscriptions, in-app payment systems, and live engagement formats that differ materially from traditional retail or static online sales. As a result, live-stream sports memorabilia sales constitute a distinct line of commerce for antitrust purposes.

132. Live-stream social-media sales are not reasonably interchangeable with traditional retail or static e-commerce platforms. Real-time auctions, integrated payment systems, algorithmic amplification, and accumulated follower bases create network effects and switching costs that prevent sellers from replicating comparable sales volume elsewhere. A breaker excluded from TikTok cannot realistically substitute eBay or brick-and-mortar retail without suffering immediate and substantial loss of revenue and market access.

**COUNT I – VIOLATION OF SHERMAN ACT §1**
**AS TO ALL DEFENDANTS**

(15 U.S.C. §1 – Conspiracy in Restraint of Trade)

133. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

134. Section 1 of the Sherman Act, 15 U.S.C. §1, prohibits contracts, combinations, and conspiracies that unreasonably restrain trade or commerce.

135. Defendant Fanatics and Defendant TikTok engaged in the conduct alleged herein.

136. Each Defendant knowingly participated in the conspiracy either by directly enforcing exclusionary conduct, exercising control over platform operations, or providing ownership, governance, or strategic direction that enabled the unlawful restraint of trade.

137. The object of the conspiracy was to exclude independent memorabilia sellers ("breakers") from TikTok unless they agreed to sell Fanatics' merchandise exclusively. The conspiracy was effectuated by:

a. Banning breakers from TikTok who sold lawful memorabilia sourced from independent distributors or former professional athletes;

b. Misrepresenting that Fanatics was the sole authorized source of NFL merchandise, when in fact Fanatics did not hold such exclusive rights;

c. Coercing breakers into purported exclusive contracts with Fanatics under threat of permanent exclusion from TikTok; and

d. Suppressing competition to enhance the market position of Fanatics and increase the valuation of both TikTok (ahead of an anticipated sale to U.S. ownership) and Fanatics (ahead of an anticipated IPO).

138. Upon information and belief, beginning in or about 2025, representatives of Fanatics and TikTok personnel engaged in direct communications regarding enforcement of alleged exclusivity rights on TikTok's platform. Shortly thereafter, TikTok implemented uniform bans and demotions targeting breakers who refused to agree to Fanatics-exclusive arrangements. The temporal proximity between these communications and enforcement actions, combined with the shared financial incentives described herein, plausibly demonstrates concerted action rather than independent business decisions.

139. As alleged above, Defendants implemented this conspiracy by disseminating false exclusivity representations and using coordinated platform enforcement to exclude authorized independent sellers and to coerce Fanatics-exclusive dealing.

140. The NFL, as part owner of Fanatics, had a direct financial stake in Fanatics' dominance and acted in concert with Fanatics to enforce exclusionary practices against competitors contrary to the players' interests, without the players' knowledge or consent and in a manner inconsistent with the collective bargaining

agreement entered on March 15, 2020, which granted the rights to "All Revenues" from the sale of NFL merchandise and memorabilia to the National Football League Players Association, team owners and individual players "until the last day of the 2030 League Year, except for the provisions relating to the Draft (Article 6), which shall remain in effect for the year immediately following" in 2031. Article 66, Section 1 of the Collective Bargaining Agreement (March 15, 2020) at p. 330.

141. Appendix A to the collective bargaining agreement provides the language that must be included in a Player contract. Among the language that is required to be included and accepted by the Player under Paragraph 4 of Appendix A, the Player must agree to grant (among other things) the following rights: "his name, nickname, initials, likeness, image, picture, photograph, animation, persona, autograph/signature (including facsimiles thereof), voice, biographical information, data concerning performance and/or movement" to the NFLPA and to promote the NFL, and agree to participate in the NFLPA Group Licensing Program. Id. at paragraph 4 PUBLICITY AND NFLPA GROUP LICENSING PROGRAM. Specifically, Appendix A (4)(b) provides as follows:

> (b) Player hereby assigns the NFLPA and its licensing affiliates, if any, the exclusive and unlimited right to use, license and sublicense the right to use his name, nickname, initials, autograph/signature (including facsimiles), voice, picture, photograph, animation, image, likeness, persona, jersey number, statistics, data (including, but not limited to data concerning performance and/or movement collected from Sensors, as defined in Article 51, Section 14 of the CBA, in NFL games), copyrights, biographical information and/or other personal indicia (individually and collectively, "Rights") for use in connection with any product, brand, service, appearance, product line or other

commercial use and any sponsorship, endorsement or promotion thereof, when more than five (5) NFL player Rights are involved, regardless of team affiliation and whether that number is reached using player Rights simultaneously or individually, in any form, media, or medium (now known or hereafter developed) during a consecutive 12-month period (a "group licensing program"). For sponsorships, endorsements, and promotions, group licensing programs are further defined as those: (a) in any one product category, as defined by industry standards; or (b) in different categories if the products all use similar or derivative design or artwork, or one player product is used to promote another player product. . . .

In consideration for this assignment of rights, the NFLPA agrees to use the revenues it receives from group licensing programs to support the objectives as set forth in the Bylaws of the NFLPA and as otherwise determined by the NFLPA Board. The NFLPA further agrees to use reasonable efforts to promote the use of NFL player Rights in group licensing programs, to provide group licensing opportunities to all NFL players, and to monitor and police unauthorized third-party use of the Rights. The NFLPA makes no representations regarding group licensing other than those expressed herein. This agreement shall be construed under Virginia law.

"Collective Bargaining Agreement" (March 15, 2020) at p. 334-336

142. To protect the players' absolute rights to their names, images, and likenesses granted to the NFLPA in exchange for participation in the group licensing program, the NFLPA created a link on its website https://nflpa.com/about/partnership-and-endorsement-policy to streamline the licensing process for thousands of applicants who seek to sell NFL Player merchandise. This assigned right of the player is limited to the term of the individual player's contract.

143. Under the terms of the collective bargaining agreement, the NFLPA reviews each applicant to make sure that whatever merchandise is being sold complies with all policies and standards of the NFL provided by the NFL and included and referenced throughout the collective bargaining agreement as well as any additional policies each club requires.

144. Once approved and a license is granted, the NFLPA is obligated to oversee and manage these merchandisers known in the industry as breakers to make sure that all revenues are accounted from that third-party merchandiser and the percentages are reconciled and received pursuant to the terms of the licensing agreement.

145. Plaintiff went through this process and bought and sold NFL sports memorabilia licensed and authorized by the NFLPA.

146. Upon information and belief, TikTok became a willing conspirator because it sought to leverage its dominance in memorabilia live-streaming — a global collectibles market valued at over $26.9 billion in 2024 and projected to reach $42.1 billion by 2030 — to enhance its valuation in anticipation of a sale to U.S. owners.

147. Upon information and belief, Fanatics sought to harness TikTok's control over consumer access and algorithmic placement to significantly increase its

market share, eliminate rivals, and strengthen pricing power in anticipation of a potential IPO or other strategic transaction.

148. Upon information and belief, the conspiracy constituted an unlawful restraint of trade under the rule of reason and, in certain respects, a group boycott and exclusionary purported exclusive-dealing arrangement. As a direct and proximate result of Defendants' unlawful agreement, Plaintiff and other breakers were excluded from the relevant market, deprived of access to customers, coerced into unfair purported exclusive contracts, and permanently damaged in algorithmic standing and business reputation.

149. Plaintiff has suffered antitrust injury, including substantial damages in an amount to be proven at trial in lost revenue, lost goodwill, and lasting competitive harm.

150. Plaintiff is entitled to recover treble damages, costs of suit, and reasonable attorney's fees pursuant to 15 U.S.C. §15, and to injunctive relief prohibiting Defendants from continuing their unlawful restraint of trade.

## COUNT II – VIOLATION OF SHERMAN ACT §2
## AS TO ALL DEFENDANTS

(15 U.S.C. §2 – Monopolization / Attempted Monopolization)

151. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

152. Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits monopolization, attempted monopolization, and conspiracies to monopolize any part of trade or commerce.

153. Defendant Fanatics and Defendant TikTok engaged in the conduct alleged herein.

154. Upon information and belief, Fanatics controls a dominant share of the licensing and primary distribution channels for NFL-branded sports memorabilia,

including long-term agreements Defendants falsely represented as exclusive with respect to trading cards, apparel, and significant segments of authenticated memorabilia. These purported exclusive arrangements, combined with coordinated control over access to dominant live-stream digital distribution channels such as TikTok, provide Fanatics with the power to control prices and exclude competition within the relevant live-stream, social-media-based retail market defined herein.

155. Upon information and belief, Defendant Fanatics possesses monopoly power in the relevant market for live-stream, social-media-based retail sale of licensed NFL sports memorabilia in the United States. Fanatics controls the primary distribution channels for NFL merchandise and holds agreements that Defendants have falsely represented as exclusive, and used those representations to restrict competitors from accessing consumers.

156. Fanatics did not acquire or maintain its market power through competition on the merits. Instead, it used threats of platform exclusion, licensing enforcement, algorithmic suppression, and retaliation to coerce Plaintiff and other sellers into exclusive arrangements they would not otherwise accept.

157. The NFL, as part owner of Fanatics, aligned its financial interests with Fanatics' strategy to maintain and expand monopoly power. By leveraging the appearance of licensing authority and co-ownership stake, the NFL provided Fanatics with the means to exclude competitors and solidify its dominance.

158. This alignment enabled the NFL to benefit financially from suppressing independent sellers and steering distribution toward Fanatics-controlled channels. The NFL's dual role as regulator and equity stakeholder created incentives to consolidate market share within Fanatics' vertically integrated distribution structure.

159. Upon information and belief, this structural alignment contributed to coordinated enforcement actions designed to remove independent breakers from TikTok and other digital platforms in favor of Fanatics-controlled sellers.

160. Upon information and belief, Defendant TikTok became a willing participant in Fanatics' monopolization scheme. TikTok had motive to enhance its own valuation in anticipation of a potential sale to U.S. ownership or other strategic restructuring by leveraging its role in a collectibles market valued at $26.9 billion in 2024 and projected to exceed $42 billion by 2030.

161. Fanatics sought to use TikTok's platform dominance to significantly increase its market share in licensed sports memorabilia and position itself for a potential IPO or other strategic transaction.

162. Defendants engaged in exclusionary conduct designed to maintain and extend Fanatics' monopoly power, including:

a. banning breakers who sold lawful memorabilia from independent sources or former players;

b. coercing breakers into purported exclusive contracts with Fanatics;

c. suppressing alternative sales channels by leveraging TikTok's algorithm to favor Fanatics' products; and

d. spreading false statements that Fanatics was the sole authorized source of NFL memorabilia.

163. These actions lacked legitimate business justification and were not designed to increase consumer welfare but to eliminate rivals and entrench Fanatics' market power.

164. As a direct and proximate result of Defendants' conduct, Plaintiff and similarly situated breakers lost access to critical sales channels, suffered substantial damages in an amount to be proven at trial, experienced permanent algorithmic demotion, and were unlawfully excluded from competing in the relevant market.

165. Defendants' conduct harmed not only Plaintiff but also competition itself: consumer choice was reduced, market prices were artificially inflated, and the value of collectibles owned by independent breakers was unfairly depressed.

166. Defendants' conduct constitutes monopolization, attempted monopolization, and conspiracy to monopolize, all in violation of Section 2 of the Sherman Act.

167. Defendants' conduct demonstrates a dangerous probability of achieving monopoly power. Fanatics has already excluded competitors through coercive platform bans and coerced purported exclusivity, and it has leveraged licensing arrangements and false exclusivity representations to eliminate rivals. Defendants acted with specific intent to monopolize, as shown by coordinated threats, misrepresentations of exclusivity, and retaliation against non-compliant sellers.

168. Plaintiff is entitled to recover treble damages, costs of suit, and reasonable attorney's fees pursuant to 15 U.S.C. §15, and to injunctive relief restoring competition and prohibiting Defendants from continuing their exclusionary conduct.

**COUNT III – VIOLATION OF CLAYTON ACT § 3**
**AS TO ALL DEFENDANTS**

(15 U.S.C. §14 – Exclusive Dealing)

169. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

170. Section 3 of the Clayton Act, 15 U.S.C. § 14, prohibits exclusive dealing arrangements that may substantially lessen competition or tend to create a monopoly in any line of commerce.

171. Defendants Fanatics and TikTok engaged in the conduct alleged herein.

172. Defendants Fanatics and the National Football League engaged in purported exclusive dealing arrangements that were presented to market participants as mandatory involving the sale and distribution of licensed NFL memorabilia goods, conditioning access to supply and continued participation in dominant distribution channels on agreements not to sell competing goods obtained from independent distributors or former professional athletes. TikTok facilitated enforcement of these

exclusive dealing conditions through coordinated platform bans and algorithmic suppression.

173. The purported exclusive contracts imposed on breakers, including Plaintiff, prohibited them from selling sports memorabilia from any source other than Fanatics. These agreements extended to lawfully licensed merchandise obtained from independent distributors and former professional athletes, effectively choking off lawful competition.

174. These exclusive dealing arrangements foreclosed independent breakers from a substantial share of the live-stream sports memorabilia market, including the dominant TikTok platform through which a majority of online memorabilia transactions occur. Exclusion from TikTok effectively foreclosed access to one of the primary commercially viable live-stream distribution channels for licensed NFL sports memorabilia in the United States, and independent breakers lacked reasonably comparable alternative platforms capable of replicating equivalent audience reach, algorithmic visibility, and sales volume.

175. Defendants coerced Plaintiff and similarly situated breakers into signing such exclusive contracts under threat of permanent bans from TikTok, the dominant platform for live-stream memorabilia sales.

176. TikTok, wielding control over algorithmic visibility and consumer access, enforced these purported exclusivity demands through misrepresentations and platform enforcement by banning breakers who refused to comply and demoting them permanently in its recommendation system.

177. The NFL, as part owner of Fanatics, provided licensing leverage to support Fanatics' purported exclusivity demands, aligning its financial interests with Fanatics' dominance and anticipated IPO valuation.

178. The practical effect of these exclusive dealing arrangements was to substantially lessen competition and foreclose independent breakers from a critical percentage of the memorabilia market. TikTok's role as a leading live-stream

commerce platform ensured that access to a significant portion of consumers was foreclosed to anyone outside Fanatics' exclusive network.

179. Fanatics used these exclusivity provisions to entrench its monopoly power, inflate its valuation in anticipation of an IPO, and reduce consumer choice in the memorabilia marketplace.

180. Plaintiff and other breakers were directly harmed by this scheme, losing substantial damages in an amount to be proven at trial in sales, suffering permanent algorithmic damage, and being deprived of the ability to lawfully compete in the sports memorabilia market.

181. Defendants' conduct constitutes exclusive dealing arrangements that substantially lessened competition, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

182. Plaintiff is entitled to damages trebled under 15 U.S.C. § 15, costs of suit, reasonable attorney's fees, declaratory relief voiding the exclusive contracts, and injunctive relief prohibiting Defendants from enforcing further unlawful exclusivity.

## COUNT IV – VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT AS TO ALL DEFENDANTS

(Cal. Bus. & Prof. Code §§ 16720 et seq.)

183. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

184. The Cartwright Act, California Business & Professions Code §§ 16720 et seq., prohibits combinations of two or more persons to restrict trade, prevent competition, or control the supply or price of goods and services within the State of California.

185. Defendants Fanatics and TikTok engaged in the conduct alleged herein.

186. Defendants Fanatics and TikTok, along with unnamed co-conspirators, entered into a contract, combination, and conspiracy to restrain trade in the market for licensed sports memorabilia and collectibles.

187. The object of this conspiracy was to:

a. eliminate independent memorabilia sellers (“breakers”) from TikTok;

b. force breakers, including Plaintiff, into coercive purported exclusive contracts with Fanatics;

c. misrepresent Fanatics’ rights as the sole authorized seller of NFL memorabilia; and

d. suppress competition in the memorabilia market to increase Fanatics’ market share and enhance its valuation in anticipation of an IPO, and to increase TikTok’s valuation in advance of its sale to U.S. ownership.

188. Defendants carried out this conspiracy by banning breakers from TikTok who did not comply, demoting them permanently in TikTok’s algorithm, and coercing them into purported exclusive dealing arrangements that foreclosed lawful competition.

189. The NFL, as part owner of Fanatics, had a direct financial stake in ensuring Fanatics’ dominance and participated in this scheme by leveraging its licensing power and aligning its commercial interests with Fanatics.

190. The agreements and conduct of Defendants unreasonably restrained trade and substantially lessened competition within California by:

a. foreclosing breakers from a significant percentage of California’s sports memorabilia market;

b. inflating consumer prices and reducing product choice;

c. artificially suppressing the resale and collector value of existing memorabilia; and

d. driving small California-based businesses out of the market.

191. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered substantial damages in an amount to be proven at trial in lost sales, permanent reputational harm, loss of algorithmic standing on TikTok, and the inability to compete fairly in California's memorabilia market.

192. Defendants' conduct constitutes a violation of the California Cartwright Act (Cal. Bus. & Prof. Code §§ 16720 et seq.)

193. Plaintiff seeks damages trebled under Cal. Bus. & Prof. Code § 16750(a), restitution, injunctive relief prohibiting Defendants from further anticompetitive practices, and reasonable attorney's fees and costs.

**COUNT V –**

**VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW**

**AS TO ALL DEFENDANTS**

(Cal. Bus. & Prof. Code § 17200 et seq.)

194. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

195. The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., prohibits any unlawful, unfair, or fraudulent business act or practice.

196. Unlawful Prong.

Defendants Fanatics and TikTok engaged in the conduct alleged herein.

Defendants engaged in conduct that constitutes violations of federal and state antitrust law, including the Sherman Act §§ 1–2, the Clayton Act § 3, and the Cartwright Act. These violations serve as predicate acts of "unlawful" conduct under the UCL.

197. Unfair Prong.

Defendants' conduct was unfair in that it:

a. excluded independent breakers, including Plaintiff, from participating in the sports memorabilia market on TikTok;

b. coerced Plaintiff into an exclusive contract with Fanatics under threat of permanent exclusion;

c. inflated consumer prices, reduced consumer choice, and suppressed the value of lawful memorabilia; and

d. permanently demoted Plaintiff and similarly situated breakers in TikTok's algorithm, causing enduring competitive harm.

These practices offend established public policy, were immoral, oppressive, and substantially injurious to consumers and competitors.

198. Fraudulent Prong.

Defendants made false and misleading statements to consumers and breakers by representing that Fanatics was the sole authorized seller of NFL memorabilia, when in fact Fanatics did not hold such exclusive rights. These misrepresentations were likely to deceive the public and did deceive consumers, who were led to believe that non-Fanatics sellers were unauthorized or illegitimate.

199. The NFL, as part owner of Fanatics, had a direct financial interest in supporting these unfair practices and provided licensing leverage to enable Fanatics' purported exclusivity scheme.

200. TikTok, acting through its U.S. operating entity TikTok USDS Joint Venture LLC and under the direction or control of ByteDance Ltd., knowingly participated in this scheme, motivated by its interest in bolstering its valuation in anticipation of a sale to U.S. ownership, and used its platform dominance to exclude competitors and support Fanatics' strategic transaction goals.

201. As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiff suffered substantial damages in an amount to be proven at trial in lost revenue, reputational damage, loss of algorithmic seniority, and coerced contractual obligations.

202. Plaintiff seeks restitution of lost money and property, injunctive relief prohibiting Defendants from continuing these practices, declaratory relief voiding the coerced contract, and attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

## COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AS TO ALL DEFENDANTS

203. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

204. Plaintiff had valid and enforceable contracts with customers, suppliers, and distributors to sell sports memorabilia, including lawful and licensed products obtained from independent distributors and former professional athletes.

205. Defendants Fanatics and TikTok engaged in the conduct alleged herein.

206. Defendants had knowledge of Plaintiff's contractual relationships. By virtue of their role in the memorabilia market and through their monitoring of TikTok activity, Defendants knew or should have known of Plaintiff's reliance on these contracts and ongoing sales relationships.

207. Defendants intentionally and unjustifiably interfered with these contracts by:

a. banning Plaintiff's TikTok account, thereby severing access to customers with whom Plaintiff had contractual and repeat-purchase relationships;

b. coercing Plaintiff into an exclusive contract with Fanatics, which directly conflicted with Plaintiff's preexisting contracts with independent distributors and sellers; and

c. spreading false statements that only Fanatics merchandise was "authorized," undermining Plaintiff's legitimacy in the eyes of customers and suppliers.

208. The NFL, as part owner of Fanatics, provided licensing leverage and financial backing to support Fanatics' scheme, knowing that it would destroy Plaintiff's existing contracts and customer relationships.

209. TikTok, acting through its U.S. operating entity TikTok USDS Joint Venture LLC and under the direction or control of ByteDance Ltd., motivated by its interest in boosting its valuation ahead of a U.S. sale, knowingly cooperated in banning Plaintiff and other breakers, fully aware that such bans would rupture contractual relationships.

210. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff's contracts with distributors and customers were breached or disrupted.

211. Plaintiff has suffered substantial damages in an amount to be proven at trial, including lost revenue from terminated contracts, diminished goodwill, and long-term competitive harm.

212. Defendants' conduct was intentional, malicious, and carried out with conscious disregard for Plaintiff's rights, thereby entitling Plaintiff to compensatory and punitive damages under California law.

## COUNT VII –
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (AS TO ALL DEFENDANTS)

213. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

214. Plaintiff had ongoing and reasonably probable economic relationships with customers, fans, and business partners who regularly purchased sports

memorabilia through its TikTok live-stream sales. These relationships had a high probability of producing future economic benefits for Plaintiff.

215. Defendants Fanatics and TikTok (collectively, "Defendants") engaged in the conduct alleged herein.

216. Defendants knew of these ongoing economic relationships. By monitoring TikTok sales channels and implementing bans targeted at breakers, Defendants were fully aware that Plaintiff's customer base and future revenue depended on continued access to the TikTok platform and its ability to sell lawful memorabilia.

217. Defendants intentionally engaged in wrongful acts designed to disrupt Plaintiff's economic relationships, including:

a. banning Plaintiff's TikTok account, which permanently severed access to existing and prospective customers;

b. coercing Plaintiff into signing an exclusive contract with Fanatics, which foreclosed opportunities to sell products from other lawful sources, including former professional athletes and independent distributors;

c. spreading false representations that only Fanatics products were "authorized," thereby undermining Plaintiff's reputation and consumer confidence; and

d. conspiring to monopolize the memorabilia market in order to inflate TikTok's valuation ahead of its sale to U.S. ownership and Fanatics' valuation ahead of its IPO.

218. The NFL, as part owner of Fanatics, participated knowingly in these actions to support Fanatics' market control, despite knowing the harm that would be inflicted on small businesses like Plaintiff's.

219. TikTok, acting through its U.S. operating entity TikTok USDS Joint Venture LLC and under the direction or control of ByteDance Ltd., motivated by its own valuation goals, knowingly enforced the bans and exclusionary practices to

support Fanatics' strategic transaction goals, fully aware that such acts would destroy Plaintiff's prospective relationships with consumers.

220. As a direct and proximate result of Defendants' intentional interference, Plaintiff's prospective economic relationships were disrupted, causing Plaintiff to lose substantial damages in an amount to be proven at trial in future revenue, customer goodwill, and market position.

221. Plaintiff has suffered damages in the form of lost profits, diminished goodwill, and reputational injury.

222. Defendants' conduct was intentional, malicious, and carried out with conscious disregard for Plaintiff's economic interests, entitling Plaintiff to compensatory and punitive damages under California law.

## COUNT VIII – FALSE ADVERTISING & UNFAIR COMPETITION AS TO ALL DEFENDANTS

(Lanham Act §43(a), 15 U.S.C. § 1125(a))

223. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

224. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits false or misleading representations of fact in commercial advertising or promotion that misrepresent the nature, characteristics, qualities, or origin of goods or services, and prohibits unfair competition through such misrepresentations.

225. Defendants Fanatics and TikTok engaged in the conduct alleged herein.

226. Defendants made and disseminated false and misleading representations of fact in interstate commerce, including through TikTok's platform, to consumers, breakers, and the public.

227. Specifically, Defendants misrepresented that Fanatics was the sole authorized source of NFL memorabilia sold on TikTok, and that breakers like Plaintiff who sold memorabilia obtained from independent distributors or former

professional athletes were "unauthorized" or "illegitimate." These representations were disseminated broadly through platform-wide seller policies, enforcement notices, and consumer-facing messaging designed to influence purchasing decisions and steer consumers toward Fanatics-controlled products.

228. These statements were materially false and misleading because Fanatics did not possess exclusive rights to all NFL memorabilia, and independent sellers lawfully obtained and resold such items.

229. Defendants made these false statements in commercial advertising and promotion with the intent to mislead consumers into believing that only Fanatics' products were authentic, thereby diverting sales and goodwill away from Plaintiff and similarly situated breakers.

230. The NFL, as part owner of Fanatics, had a direct financial interest in promoting these misrepresentations and knowingly supported Fanatics' strategy to exclude independent competitors.

231. TikTok, acting through its U.S. operating entity TikTok USDS Joint Venture LLC and under the direction or control of ByteDance Ltd., disseminated these misrepresentations through its platform policies, moderation practices, and consumer-facing communications, motivated by its goal of increasing its valuation ahead of a U.S. sale.

232. These false statements actually deceived or had a strong tendency to deceive a substantial segment of consumers, who reasonably believed that Fanatics was the only authorized seller of NFL memorabilia on TikTok.

233. Plaintiff has been and continues to be injured as a direct and proximate result of Defendants' false and misleading representations, including the loss of substantial damages in an amount to be proven at trial in sales, damage to its reputation, diminished consumer trust, and permanent impairment of its business standing in the memorabilia market.

234. Defendants' conduct constitutes false advertising and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

235. Plaintiff is entitled to damages, including Defendants' profits, treble damages for willful misconduct, injunctive relief prohibiting further false advertising, and attorney's fees and costs.

## COUNT IX – COMMON LAW UNFAIR COMPETITION AS TO ALL DEFENDANTS

236. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

237. Under California common law, unfair competition is broadly defined to include unlawful, unfair, or fraudulent business practices, as well as acts of "passing off," misappropriation, and other practices by which one business wrongfully interferes with another's ability to compete fairly.

238. Defendants Fanatics and TikTok engaged in the conduct alleged herein.

239. Defendants Fanatics and TikTok engaged in unfair competition by conspiring to exclude Plaintiff and other independent memorabilia sellers ("breakers") from TikTok's marketplace, coercing breakers into exclusive contracts with Fanatics, and disseminating false statements to consumers that only Fanatics products were authorized or legitimate.

240. These acts were undertaken for the purpose of destroying lawful competition, inflating Fanatics' market position ahead of its anticipated IPO, and increasing TikTok's valuation ahead of its planned sale to U.S. ownership.

241. The NFL, as part owner of Fanatics, had a direct financial stake in supporting this unfair scheme, leveraging its licensing power to foreclose rivals and entrench Fanatics' dominance.

242. TikTok, acting through its U.S. operating entity TikTok USDS Joint Venture LLC and under the direction or control of ByteDance Ltd., aided Fanatics

and the NFL by enforcing bans, permanently demoting breakers in its algorithm, and providing a platform for Fanatics' false exclusivity claims.

243. Defendants' acts of unfair competition were wrongful, unjustified, and contrary to public policy favoring open and competitive markets.

244. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial damages in an amount to be proven at trial in lost sales, damage to its reputation, the destruction of customer goodwill, and the loss of its algorithmic seniority and business standing in the sports memorabilia marketplace.

245. Defendants' conduct constitutes common law unfair competition under California law.

246. Plaintiff seeks compensatory damages, restitution, injunctive relief preventing Defendants from continuing their unfair competition, and punitive damages for Defendants' willful and malicious conduct.

**COUNT X –**

**BREACH OF COVENANT OF GOOD FAITH & FAIR DEALING**

**AS TO TIKTOK DEFENDANTS**

247. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

248. Defendant TikTok engaged in the conduct alleged herein.

249. Plaintiff maintained contractual relationships with TikTok through TikTok's platform terms of service and commercial account agreements, which governed Plaintiff's ability to operate a breaker business and sell sports memorabilia through TikTok's live-stream marketplace.

250. Every contract under California law contains an implied covenant of good faith and fair dealing, requiring each party not to act in bad faith or unfairly interfere with the other party's right to receive the benefits of the agreement.

251. Plaintiff reasonably expected that TikTok would provide access to its platform in good faith, apply its rules fairly and consistently, and not engage in arbitrary or conspiratorial conduct designed to favor one competitor over another.

252. TikTok breached the covenant of good faith and fair dealing by:

a. arbitrarily banning Plaintiff's account despite Plaintiff's compliance with applicable laws and the lawful sale of licensed memorabilia;

b. conspiring with Fanatics and the NFL to exclude Plaintiff and other breakers from the marketplace;

c. misrepresenting that only Fanatics merchandise was authorized, thereby undermining Plaintiff's legitimate sales; and

d. permanently demoting Plaintiff's algorithmic ranking, effectively destroying its ability to regain the benefits of its contract even if reinstated.

253. These actions were taken in bad faith, were not supported by any legitimate contractual purpose, and were motivated by TikTok's desire to bolster Fanatics' market position in anticipation of Fanatics' IPO and to inflate TikTok's own valuation ahead of its anticipated U.S. sale.

254. As a direct and proximate result of TikTok's breach of the implied covenant, Plaintiff lost substantial damages in an amount to be proven at trial in revenue, suffered reputational harm, lost customer goodwill, and permanently lost the algorithmic seniority that formed the foundation of its business on TikTok.

255. Plaintiff seeks compensatory damages for its losses, restitution, declaratory relief restoring its account with algorithmic seniority, and punitive damages based on TikTok's willful and malicious conduct.

///

///

## COUNT XI — REQUEST FOR INJUNCTIVE RELIEF AS TO ALL DEFENDANTS

256. Plaintiff realleges and incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

257. Any injunctive relief ordered by this Court shall bind Defendants, their successors, assigns, parent entities, subsidiaries, officers, agents, and all persons or entities acting in concert with or under their control, consistent with Federal Rule of Civil Procedure 65(d).

258. Plaintiff seeks injunctive relief prohibiting Defendants from engaging in further algorithmic suppression, shadow-banning, or retaliatory enforcement.

259. This injunction shall apply regardless of any change in ownership, corporate structure, or governance of TikTok's U.S. operations.

260. Defendants' conduct, as described above, has caused and will continue to cause Plaintiff irreparable harm for which there is no adequate remedy at law.

261. Unless enjoined by this Court, Defendants will continue their unlawful acts harming Plaintiff (and those similarly situated) by engaging in the following unlawful acts:

a. Allowing Fanatics (or through the NFL) to unlawfully and wrongfully allege trademark and copyright violations on social media and online sales platforms resulting in violations and permanent bans.

b. Unlawful and wrongful gamblification violations (allegations of gambling) resulting in violations and permanent bans.

c. Targeting companies like Plaintiff who compete with Fanatics in selling sports memorabilia with automatic suspension of social media and online sales accounts without notice or due process.

d. Having Defendants or their agents threaten, pressure, or coerce Plaintiff to sign exclusive distribution contracts with Fanatics, including by

conditioning continued platform access, visibility, monetization, or live-selling privileges on acceptance of such terms.

e. Unlawfully diminishing and/or outright destroying the value of existing independently sourced, genuine, licensed, and PSA graded sport memorabilia.

f. Retaliating against Plaintiff or other breakers—including through suppression, demotion, demonetization, suspension, or other enforcement actions—because they refuse to enter exclusive dealing arrangements with Fanatics.

g. Continuing to suppress, demote, or limit Plaintiff's visibility, reach, monetization, or live-selling privileges through algorithmic or discretionary platform controls as part of the challenged exclusionary scheme.

h. All of which result in continued and irreparable injury to Plaintiff.

262. Plaintiff has a substantial likelihood of success on the merits of the case, will suffer irreparable harm in the absence of injunctive relief, and the balance of equities and public interest favor granting such relief.

## EXHIBITS

Plaintiff attaches the following exhibits in support of the allegations set forth herein:

- Exhibit A – A true and accurate copy of the SNL Consulting Agreement
- Exhibit B – Example of TikTok account violation
- Exhibit C – Text screenshots between Plaintiff and Legend on August 18, 2025
- Exhibit D – Text screenshots between Plaintiff and Legend on September 4, 2025
- Exhibit E – Text screenshots between Plaintiff and Steve Halupka on June 17, 2025

///

## VI. PRAYER FOR RELIEF

Plaintiff requests that the Court:

263. Award damages in an amount to be proven at trial, trebled under federal antitrust laws.

264. Order reinstatement of Plaintiff's TikTok account, with restoration of Plaintiff's account and commercially reasonable reinstatement of visibility and live-selling functionality.

265. Declare Fanatics' exclusive contract unenforceable and void as against public policy.

266. Issue injunctive relief preventing Defendants from engaging in future anticompetitive conduct.

267. Award attorney's fees and costs pursuant to 15 U.S.C. § 15 and Cal. Bus. & Prof. Code § 17200.

268. Grant such further relief as the Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

269. Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: September 8, 2026

/s/ Jeremy C. Shafer

Jeremy C. Shafer, Bar No. 235318
**eJustice LLP**
2001 L Street NW, Suite 500
Washington, DC 20036
Tel: (800) 210-3638
Email: JeremyS@eJustice.com

John Dalimonte, Esq.
**eJustice LLP**
2001 L Street NW, Suite 500
Washington, DC 20036
Tel: (800) 210-3638
Email: JohnD@eJustice.com
*(Pending Pro Hac Vice*)

Aaron Dickey, Esq.
**eJustice LLP**
2001 L Street NW, Suite 500
Washington, DC 20036
Tel: (800) 210-3638
Email: AaronD@eJustice.com
*(Pending Pro Hac Vice*)

*Attorneys for Plaintiff*
DORMDUDESBREAKS, LLC *dba*
DORM DUDES